IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

|  |  |  |
|---|---|---|
| MARCUS NORWOOD, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 2:13-cv-02582-STA-tmp |
| | ) | |
| JONATHAN LEBO, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**ORDER TO MODIFY THE DOCKET,
DENYING PETITION PURSUANT TO 28 U.S.C. § 2254,
DENYING A CERTIFICATE OF APPEALABILITY,
CERTIFYING THAT AN APPEAL WOULD NOT BE TAKEN IN GOOD FAITH
AND
DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Before the Court is the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("§ 2254 Petition") filed by Petitioner, Marcus Norwood, Tennessee Department of Correction prisoner number 478655, an inmate at the West Tennessee State Penitentiary ("WTSP") in Henning, Tennessee. (§ 2254 Pet., *Norwood v. Lebo*, No. 2:13-cv-02582-STA-tmp (W.D. Tenn.), ECF No. 1.) For the reasons stated below, the Court **DENIES** the § 2254 Petition.

I. **BACKGROUND**

A. **State Court Procedural History**

On October 1, 2009, a grand jury in Shelby County, Tennessee, returned an indictment charging Norwood with the first degree murder of Earnest Jackson. (Indictment, *State v. Norwood*, No. 09-06261 (Shelby Cnty. Crim. Ct.), ECF No. 7-1 at PageID 85-86.) On October

14, 2010, Norwood entered an *Alford* plea to second degree murder in exchange for a negotiated

sentence of twenty-five years to be served at 100% as a violent offender. (Pet. for Waiver of Trial

by Jury and Request for Acceptance of Plea of Guilty, *id.*, ECF No. 7-1 at PageID 87; Order on

Guilty Plea, *id.*, ECF No. 7-1 at PageID 88; Guilty Plea Hr'g Tr., *id.*, ECF No. 7-2 at PageID

129-42.) At the guilty plea hearing, the prosecutor advised the judge that the victim's family

opposed the plea because "they believe a plea to second degree murder is insufficient punishment

. . . and they think that he deserves a greater punishment than this." (Guilty Plea Hr'g Tr. at

PageID 130-31, *id.*, ECF No. 7-2.) The prosecutor summarized the factual basis for the charge:

> If the matter had gone to trial, the State would have shown that on
> September the 16th of 2008, officers of the Memphis Police Department were
> called to the University Cabana Apartments here in Shelby County. When they
> arrived, they found Mr. Jackson in that apartment building in Apartment Number 5.
> He had suffered five stab injuries, which resulted in his death[,] and a shell casing
> on the scene indicated that he had had a weapon fired at him. Within the hour,
> officers were contacted by the defendant, Marcus Norwood's friends and family
> members stating that he wished to turn himself in. He did turn himself in.
>
> He gave a statement to the police indicating that he had gone to the
> apartment complex, an argument had ensued between him and the victim, Mr.
> Jackson. Mr. Norwood's version of events was that there was a struggle at which
> point the victim, Mr. Jackson, was stabbed. For the record, Mr. Jackson suffered
> five stab injuries and Mr. Norwood had no injuries at the time the police took his
> statement one hour after Mr. Jackson's death.

(*Id.* at PageID 131-32.) Defense counsel stipulated to those facts. (*Id.* at PageID 132.) Defense

counsel explained that, "in our discussions with Mr. Norwood we explained to him lesser included

offenses and that sort of thing. He is concerned that if he went to trial and did not prevail, that he

would receive an automatic life sentence." (*Id.*) According to his attorney, Norwood

understood that his release eligibility date for a first degree murder conviction would be more than

double what it would be under the plea agreement. (*Id.* at 4-5.)

During the guilty plea colloquy, Norwood testified that he understood the rights he was waiving by pleading guilty.  (*Id.* at PageID 134-36, 138, 139.)  Norwood understood what the State would have to prove in order to convict him of first degree murder.  (*Id.* at PageID 136.) He also understood that, if convicted of first degree murder, he would be required to serve at least fifty-one years before being eligible for parole.  (*Id.*)  Norwood understood that second degree murder is the knowing killing of another without premeditation.  (*Id.* at PageID 136-37.)  He was aware that the sentencing range for second degree murder was between fifteen and sixty years with no possibility of parole and that the negotiated sentence of twenty-five years was the maximum sentence that could be imposed on a Range I standard offender for second degree murder.  (*Id.*) Norwood also understood the requirements for voluntary manslaughter and criminally negligent homicide.  (*Id.* at PageID 137-38.)  Norwood testified as follows:

> Q.      Is there anything else, Mr. Norwood, about this plea that you don't understand, anything you're confused about you want me to explain for you?

> A.      No.  I understand everything, sir.

> Q.      I understand Mr. Hall and Mr. Alston have been working with you on this.  Is there anything about what they've done that you think they should do more or didn't do enough?

> A.      No, sir.

> Q.      Do you feel like you've been represented okay?

> A.      Yes, sir.

> Q.      Okay.  Do you have any other questions?

> A.      No, sir.

> Q.      Are you entering this plea freely and voluntarily, without any threats or pressures or promises?

A.     Yes, sir.

(*Id.* at PageID 139-40.)   Judgment was entered on October 14, 2010.   (J., *State v. Norwood*, No.
09-06261 (Shelby Cnty. Crim. Ct.), ECF No. 7-1 at PageID 89.)   Norwood did not take a direct
appeal, having waived the right to do so.

On June 9, 2011, Norwood filed a *pro se* petition in the Shelby County Criminal Court
pursuant to the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122.
(Pet. in Supp. of Post-Conviction Relief, *Norwood v. State*, No. 09-06261 (Shelby County Crim.
Ct.), ECF No. 7-1 at PageID 90-97.)   Counsel was appointed to represent Norwood (Order
Appointing Private Counsel for Indigent Pet'r, *id.*, ECF No. 7-1 at PageID 118), and an amended
petition was filed on November 2, 2011 (Am. Pet. for Post-Conviction Relief, *id.*, ECF No. 7-1 at
PageID 119-22.)   A hearing on the post-conviction petition was held on March 29, 2012.
(Post-Conviction Hr'g Tr., *id.*, ECF No. 7-3.)   The post-conviction court denied relief on the
record (*id.* at 107-15) and in an order entered on April 3, 2012 (Order Denying Pet. for Post
Conviction Relief, *Norwood v. State*, No. 09-06261 (Shelby Cnty. Crim. Ct.), ECF No. 7-1 at
PageID 123-25.)   The Tennessee Court of Criminal Appeals ("TCCA") affirmed.   *Norwood v.
State,* No. W2012-00754-CCA-R3-PC, 2013 WL 1043556 (Tenn. Crim. App. Mar. 13, 2013),
*appeal denied* (Tenn. June 13, 2013).

**B.     Procedural History of Norwood's § 2254 Petition**

On July 29, 2013, Norwood filed his *pro se* § 2254 Petition.   (§ 2254 Pet., *Norwood v.
Lebo*, No. 2:13-cv-02582-STA-tmp (W.D. Tenn.), ECF No. 1.)   The sole issue presented is
whether Norwood's "CONVICTION WAS BASED ON [AN] UNLAWFULLY INDUCED
GUILTY PLEA."   (*Id.* at 5; *see also id.* at 5-7.)

4

On July 31, 2013, the Court directed Norwood to file a properly completed *in forma pauperis* affidavit or pay the habeas filing fee. (Order, *Norwood v. Lebo*, No. 2:13-cv-02582-STA-tmp (W.D. Tenn.), ECF No. 2.) Norwood paid the habeas filing fee on August 9, 2013. (Case initiation fee, *id.*, ECF No. 3.) In an order issued on October 3, 2013, the Court directed Respondent, Jerry Lester, who was, at the time, the Warden of the WTSP, to file the complete state-court record and a response to the § 2254 Petition. (Order, *id.*, ECF No. 5.)[1]

On October 25, 2013, the Warden filed his Answer to Petition ("Answer") and most of the state-court record. (Answer, *Norwood v. Lebo*, No. 2:13-cv-02582-STA-tmp (W.D. Tenn.), ECF No. 6; Resp't's Not. of Filing, *id.*, ECF No. 7.) Norwood did not file a reply.

## II.        THE LEGAL STANDARD

The statutory authority for federal courts to grant habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

### A.        Waiver and Procedural Default

Twenty-eight U.S.C. § 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The petitioner

---

[1] The Clerk is directed to substitute current WTSP Warden Jonathan Lebo for Jerry Lester as respondent. *See* Fed. R. Civ. P. 25(d).

must "fairly present"[2] each claim to all levels of state court review, up to and including the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), except when the state has explicitly disavowed state supreme court review as an available state remedy, *O'Sullivan v. Boerckel*, 526 U.S. 838, 847-48 (1999). Tennessee Supreme Court Rule 39 eliminated the need for a prisoner to seek review in the Tennessee Supreme Court to "be deemed to have exhausted all available state remedies." *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); *see Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010) (the *Adams* holding promotes comity by requiring that state courts have the first opportunity to review and evaluate claims and by mandating that federal courts respect the duly promulgated rule of the Tennessee Supreme Court that recognizes that court's law and policy-making function and its desire not to be entangled in the business of simple error correction).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977); *see Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (a federal habeas court will not review a claim rejected by a state court "if the decision of that court rests on a state law ground that is independent of the federal question and

---

[2] For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (citation omitted. Nor is it enough to make a general appeal to a broad constitutional guarantee. *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

adequate to support the judgment").   If a claim has never been presented to the state courts, but a state court remedy is no longer available (*e.g.*, when an applicable statute of limitations bars a claim), the claim is technically exhausted, but procedurally barred.  *Coleman*, 501 U.S. at 732; *see Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004) (the procedural default doctrine prevents circumvention of the exhaustion doctrine), *partial abrogation on other grounds recognized by Peoples v. Lafler,* 734 F.3d 503, 511-12 (6th Cir. 2013).

Under either scenario, a petitioner must show "cause" to excuse his failure to present the claim fairly and "actual prejudice" stemming from the constitutional violation or, alternatively, that a failure to review the claim will result in a fundamental miscarriage of justice.  *Schlup v. Delo*, 513 U.S. 298, 322 (1995); *Coleman*, 501 U.S. at 750.   The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime.   *Schlup*, 513 U.S. at 321; *see House v. Bell*, 547 U.S. 518, 536-39 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

## B.     Merits Review

Section 2254(d) establishes the standard for addressing claims that have been adjudicated in state courts on the merits:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).   The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt."   *Cullen*, 563 U.S. at 181 (internal quotation marks and citations omitted).[3]

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.   *Cullen*, 563 U.S. at 181-82, 185.   A state court's decision is "contrary to" federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts."   *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).[4]   An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case."   *Id.*, 529 U.S. at 413.   The state court's application of clearly established federal law must be "objectively unreasonable."   *Id.* at 409.   The writ may not issue merely because the habeas court, in its independent judgment, determines that the state court decision applied clearly established federal law erroneously or incorrectly.   *Renico v. Lett*, 559 U.S. 766, 773 (2010); *Williams*, 529 U.S. at 411.   "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being

_____

[3] The AEDPA standard creates "a substantially higher threshold" for obtaining relief than a *de novo* review of whether the state court's determination was incorrect.   *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

[4] The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them."   *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *see Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (same); *Treesh v. Bagley*, 612 F.3d 424, 429 (6th Cir. 2010) (same).

presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

There is little case law addressing the standard in § 2254(d)(2) that a decision was based on "an unreasonable determination of facts." However, in *Wood v. Allen*, 558 U.S. 290, 301 (2010), the Supreme Court stated that a state court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. In *Rice v. Collins*, 546 U.S. 333, 341-42 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination."[5]

"Notwithstanding the presumption of correctness, the Supreme Court has explained that the standard of § 2254(d)(2) is 'demanding but not insatiable.'" *Harris v. Haeberlin*, 526 F.3d 903, 910 (6th Cir. 2008) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)). "Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.'" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A state court adjudication will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010); *see Hudson v. Lafler*, 421 F. App'x 619, 624 (6th Cir. 2011) (same).

---

[5] In *Wood*, 558 U.S. at 293, 299, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), a petitioner must establish only that the state-court factual determination on which the decision was based was "unreasonable," or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence. The Court ultimately found it unnecessary to reach that issue. *Id.* at 300-01, 304-05. In *Rice*, 546 U.S. at 339, the Court recognized that it is unsettled whether there are some factual disputes where § 2254(e)(1) is inapplicable.

**III.        ANALYSIS OF PETITIONER'S CLAIM**

In his § 2254 Petition, Norwood argues that his conviction was based on an unlawfully induced guilty plea.  (§ 2254 Pet. at 5, *Norwood v. Lebo*, No. 2:13-cv-02582-STA-tmp (W.D. Tenn.), ECF No. 1.)    Specifically, Norwood alleges that "TRIAL COUNSEL TOLD PETITIONER THAT HE WAS GUILTY BECAUSES HE GAVE A STATEMENT.  TRIAL COUNSEL TOLD THE PETITIONER 'HE CAN'T DO NOTHING FOR HIM,' THAT HE NEED TO TAKE THE TWENTY-FIVE YEARS, ETC."  (*Id.*)

Norwood raised this issue in his amended post-conviction petition.  (Am. Pet. for Post-Conviction Relief at 1, *id.*, ECF No. 7-1 at PageID 119.)   The TCCA has summarized the evidence introduced at the post-conviction hearing:

> At the post-conviction hearing, trial counsel testified that at the time he represented Petitioner he had more than ten years of experience as an assistant public defender.  He was appointed to represent Petitioner, requested discovery, and provided Petitioner with a copy of the documents.   Trial counsel assessed the case and surmised that one of the largest obstacles would be overcoming Petitioner's confession.   Trial counsel anticipated going to trial on the first degree murder charge but Petitioner asked trial counsel to explore a plea agreement.   The prosecutor agreed to a guilty plea to second degree murder with a twenty-five year sentence.
>
> When trial counsel first informed Petitioner about the plea offer, Petitioner was "reluctant" because he thought that twenty-five years was too long and he should get "around ten years" for the crime.   Trial counsel explained to Petitioner that if they got a trial date set in the case "there was no more possibility of a deal."   Trial counsel opined that Petitioner was "in denial" about the severity of the charge and did not think it was even remotely possible for Petitioner to get a deal that would lead to a mere ten years in jail when someone died as a result of Petitioner's actions.   Trial counsel "thought the deal was good."   Petitioner gave trial counsel permission to discuss the deal with his family; Petitioner's mother encouraged him to take the plea agreement.
>
> As part of the trial process and negotiations of the plea agreement, trial counsel met with Petitioner several times.   These included at least five visits at the jail and about six times in court.  Petitioner explained the facts to trial counsel,

claiming that he went to talk to his ex-girlfriend and was confronted by the victim. When they got into an argument, the victim grabbed a knife. Petitioner claimed that he got the knife away and stabbed the victim. When the victim came toward Petitioner, Petitioner took out his gun and shot the floor.

Trial counsel thought the possibility of getting convicted of a lesser included offense at trial was slim and that the self-defense theory advanced by Petitioner was weak. Trial counsel was also concerned about potential testimony by Petitioner's ex-girlfriend about their history of domestic violence. Trial counsel admitted that he stopped interviewing witnesses in preparation for trial when plea negotiations became imminent.

Petitioner testified about his dissatisfaction with trial counsel's representation. He thought that the proper strategy was one of self-defense but admitted that it would be difficult under the circumstances. The day prior to the guilty plea, Petitioner sent trial counsel a letter in which he claimed that twenty-five years was "more time" than he "deserve[s]" for the crime but that he would accept the plea agreement because it was in his best interest." He asked trial counsel "to sign under the Alford plea." Petitioner felt that trial counsel did not put any effort into his case and claimed that he pleaded guilty because he did not have a choice. Petitioner thought that he should have gotten "manslaughter at the worst."

Petitioner claimed that trial counsel met with him three times at the jail and twice in court prior to the plea. Further, he claimed that trial counsel never talked about lesser included offenses or the possibility of a plea. Petitioner also stated that he received discovery but that trial counsel did not review the packet with him. Petitioner claimed that the only advice trial counsel gave him was to take the plea deal. Petitioner denied that it was his idea to seek a plea deal. Petitioner thought that twenty-five years was "too much time" and that he even asked trial counsel to remove himself from his case.

On the day of the plea agreement, trial counsel met with Petitioner and reviewed the plea. Petitioner was described as somewhat hostile, and stated that his attorney did not "give a damn" about him. Petitioner claimed he "didn't have [anybody] to really try to help me for a defense, so [he] just gave in and signed."

Arcaya Love, Petitioner's ex-girlfriend, testified at the hearing. She did not recall being interviewed by police or by trial counsel. She could not recall a lot of the details surrounding the incident because she had since been involved in an auto accident in which she sustained a serious head injury. Ms. Love was able to recall various incidents of domestic violence, one in particular during which Petitioner attacked her when he learned she was pregnant with the victim's child. Petitioner attacked her in an attempt to cause her to miscarry. Petitioner was trying to reconcile with Ms. Love at the time that the victim was killed. Ms. Love

testified that Petitioner had changed and that she was not afraid of him. She admitted that he was the father of her children.

*Norwood v. State*, 2013 WL 1043556, at *2-3.

The post-conviction court denied relief in a lengthy oral ruling, based on the following

factual findings:

> There are questions the Court would try to consider in looking at what type of a defense would be put on. The defendant admits that he went over to [Ms. Love's] house. His explanation today doesn't make a whole lot of sense, at least, to me.
>
> . . . .
>
> She has an explanation, at least, by her testimony today, that the defendant knew that she wasn't going to be there and knew the children weren't going to be there.
>
> Again, which gives more, at least in my opinion, credence to the issue of motive as to why the defendant went over there that morning, what he was looking for, who he was looking for.
>
> There's obviously a confrontation between him and the new boyfriend, the victim. The defendant leaves the incident uninjured, unwounded. The victim has multiple stab wounds. There's been a gunshot fired. The defendant admits he fired a gun. The defendant admits he stabbed the victim.
>
> All of those things weigh very heavily against any type of argument for a killing in the heat of passion. You could make an argument that there was a heat of passion, but that the aggressor was Mr. Norwood.
>
> And there's nothing that would indicate to the Court that even a reasonable argument of self defense could be raised. I mean, I have to agree with Mr. Alston to the point that self defense is about the only thing you could raise, based upon Mr. Norwood's statement. But, it would be a difficult task to convince a jury in my opinion, based upon the injuries inflicted on the victim and the lack of injuries to the defendant that this even rises to a self defense argument.
>
> And those are all factors that I think would play into the advice given in this case.

As to what type of investigation, apparently this does not appear that this is a complex case. It appears—I don't know what other proof there would have been had the case gone to trial, but obviously there must have been something else, besides a confession, but you have a history of animosity between Ms. Love and the defendant.

I assume that she would have been testifying about these threats that she had received against the victim and her. All of those are factors that apparently everybody was aware from the very beginning . . . . I think we see today a woman who has children by the defendant. A woman who obviously had some affections for the defendant, at different points in her life.

But, we also, based upon her testimony and based upon what she told the police at the time, find a woman who swore out restraining orders against the defendant, filed police reports against the defendant for assaulting her on several occasions, preceding this incident and I think all of those are factors that had Mr. Alston gone out to interview her, I am not sure he would have gleaned from that interview and I don't think that whatever emotional ties that we see today, with Mr. Norwood, between Ms. Love, as the father of her children, I am not sure based on what I heard and what I saw that she felt that way at the time.

So I don't see, you know, the fact that he did not go out and interview her, in any way raises a flag that would cause me to believe that he didn't know what was going on in the case.

I don't believe it rises to a reasonable probability that had he interviewed her it would have changed his position, or how he felt, or what he felt was going to happen if they went to trial.

I think that he testified that he met with the defendant, at least—how many times is that—he met with the defendant in the jail, five times. And then he says he met with him in the Court every time they came up here. That he'd spend an hour, or hour and a half with the defendant in the jail. I know he said that, at least, on one occasion.

And again, you have a statement, albeit self serving, but even a self serving statement puts the defendant there, it puts the defendant, you know, in a very compromising position when you look at the autopsy and what the medical examiner's going to testify to, as to the depth of the wounds, the severity of the wounds, the location of the wounds. Whether or not these are defensive wounds on the hands. There are a lot of factors that weigh heavily against Mr. Norwood if his case were being presented to a jury.

And then, you add in the fact that there was animosity between him and Ms. Love over the new boyfriend, over the fact that she had been pregnant by the new boyfriend. And obviously there were issues based upon her statement, assuming that that proof would of come out, about him stalking her and again the domestic violence involved.

When you weigh all of those factors as to what the proof was going to be I think Mr. Alston's advice that, if you go to trial and get convicted of murder in the first degree and based upon your statement there's a good chance that that could occur, when you look at all of the other facts that go along with that confession and that, you know, the alternative is life in prison and based upon the testimony of Mr. Alston he wasn't asking [the State for an offer].

I assume the reason for that would be, based upon the District Attorney's position that they don't negotiate murder first degree cases, that he wasn't even asking, or seeking an offer, until the defendant asked him to try to get one. And at that point the District Attorney's Office made an offer of twenty-five years and obviously Mr. Norwood wanted something less and I am sure that Mr. Alston tried to get something less, but that is the negotiated offer that was put forth and I don't know that it's been actively testified to in here, but I think that it's been evident from the inferences of both Mr. Alston and the defendant that Judge Craft's position at that time and at least still to be today is, once you set a case for trial there's no more plea bargaining. There would have to be a guilty plea, as charged, to murder in the first degree and a life sentence, or he would [not] accept the guilty plea, after the case was set for trial.

And I think Mr. Alston testified that the defendant was unhappy and there was discussion about setting it for trial and he told him to think about it and gave him several, apparently, continuances to think about it and apparently Mr. Alston communicated with the defendant's family about his concerns and had the family confer with Mr. Norwood about what was going to happen and what could happen if the case was scheduled for trial and would actually go to trial.

And you know it's a sad situation that I—to be quite honest with you—I can sympathize with Mr. Norwood for being put in that position of having to make a decision. Twenty five years at 100% is a lot of time. Especially for someone who's never been in any trouble before, or never done any time before, I am sure that's a whole lot of time.

But when you weigh that against the potential of getting life in prison and never being able to get out, that's a tough decision to make and it's a tough gamble to roll the dice, if you will and go to trial and face the potential of getting life when there's not a whole lot of defense.

And I asked Mr. Norwood, I mean, what was your defense? What is it that you wanted investigated? What did you want proved? And it was just that it wasn't first degree murder.

Well, the offer was second degree murder. Well, you know, I want a voluntary manslaughter. Well, the District Attorney is not willing to give a voluntary manslaughter, you know.

. . . .

And I've looked at the standards in Strickland versus Washington and again, I think when you weigh and look at all of the factors, I don't think that the defense has met that burden of proof.

With regard to the issues you've argued, I don't find the defendant to lack intelligence. Whether he is familiar with the system, or not, the fact that he's never been in the system before, I don't find that he is not capable of understanding the system.

Competency of counsel, I think Mr. Alston is an experienced trial lawyer in these Courts and has been. I think the advice that he provided to Mr. Norwood was correct advice, good advice, given by a competent trial lawyer who can analyze the value of a case and what is potentially likely to happen.

There is nothing to indicate to me that he didn't thoroughly confer with Mr. Norwood and discussed these issues with him, advised him of the charges, advised him of what the potential of what was going to happen.

. . . .

And I think Mr. Norwood's reluctance to accept the plea, under an Alford situation. Obviously he understood what Alford Versus North Carolina was. He implied that in his letter that he wrote to Mr. Alston.

He didn't like the twenty-five years, but he thought that it was in his best interest, when he weighed that versus life in prison and I just think that this, again, is one of those situations where when reality finally sets in as it usually does, that it is a hard pill to swallow.

. . . .

And again, it is a sad situation and I think that Judge Craft even commented on it, at the end, if I remember right in reading the transcript of the guilty plea that it's a sad situation, that it is unhappy for both sides. That the victim lost his life

and this defendant, somebody that hadn't been in a lot of trouble before is going to the penitentiary for a long time.

But, it is what it is and in this case it was a second degree murder, which is a very serious violent offense and I find that Mr. Norwood freely and voluntarily entered his guilty plea with full knowledge of what to anticipate what could happen to him if he went to trial, the rights that he was willing to give up.

I don't find that he was coerced in any way to enter this guilty plea. I don't find that Mr. Alston's efforts on his behalf were deficient in any way. I don't find that Mr. Norwood was inadequately represented by Mr. Alston. I find that just the opposite is true. Mr. Alston was able to secure for him an offer much less than life in prison and I think Mr. Norwood accepted that reality for what it was, as much as he didn't like it and as much as he still doesn't like it.

But, I think that he understood what he was doing when he took it and I don't find anything in there that indicates that he had anything other than just regrets that he had to do that much time.

So, I find that Judge Craft, thoroughly, interviewed Mr. Norwood and thoroughly went over all of his rights, including discussions on lesser included offenses, everything that Mr. Norwood was entitled to. And I find that Mr. Norwood freely and voluntarily entered that plea, based upon that being his desire, his wish and not based upon any deficiencies by Mr. Alston, or any lack of representation by Mr. Alston, I don't find that.

(Post-Conviction Hr'g Tr. 107-15, *Norwood v. State*, No. 09-06261 (Shelby Cnty. Crim. Ct.), ECF No. 7-3.) That decision was memorialized in a written order. (Order Denying Pet. for Post Conviction Relief at PageID 123-24, 125, *id.*, ECF No. 7-1.)

Norwood challenged the voluntariness of his guilty plea in his brief to the TCCA on the post-conviction appeal. (Br. of Appellant at 1, *Norwood v. State*, No. W2012-00754, CCA-R3-PC (Tenn. Crim. App.), ECF No. 7-4 at PageID 326.) Specifically, Norwood argued, *inter alia*, that he was forced to plead guilty because his trial counsel failed to conduct a factual investigation and refused to set the case for trial. (*Id.* at 16-18.) The TCCA denied relief on the merits, reasoning as follows:

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). During our review of the issues raised, we will afford those findings of fact the weight of a jury verdict, and this Court is bound by the post-conviction court's findings unless the evidence in the record preponderates against those findings. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *Alley v. State*, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). This Court may not re-weigh or re-evaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. *See State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing by clear and convincing evidence that (a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial. *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996); *see also* T.C.A. § 40-30-110(f). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley*, 960 S.W.2d at 580.

As noted above, this Court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. *See id.* at 578. However, our supreme court has "determined that issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact ...; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. *Burns*, 6 S.W.3d at 461.

Furthermore, on claims of ineffective assistance of counsel, Petitioner is not entitled to the benefit of hindsight. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See id.* However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Once a guilty plea has been entered, effectiveness of counsel is relevant only to the extent that it affects the voluntariness of the plea. In this respect, such claims of ineffective assistance necessarily implicate the principle that guilty pleas be voluntarily and intelligently made. *See Hill v. Lockhart*, 474 U.S. 52, 56, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985) (citing *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970)). As stated above, in order to successfully challenge the effectiveness of counsel, Petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *See Baxter*, 523 S.W.2d at 936. Under *Strickland v. Washington*, Petitioner must establish: (1) deficient representation; and (2) prejudice resulting from the deficiency. 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). However, in the context of a guilty plea, to satisfy the second prong of *Strickland*, Petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59; *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

When analyzing a guilty plea, we look to the federal standard announced in *Boykin v. Alabama*, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969), and the State standard set out in *State v. Mackey*, 553 S.W.2d 337 (Tenn. 1977). *State v. Pettus*, 986 S.W.2d 540, 542 (Tenn. 1999). In *Boykin*, the United States Supreme Court held that there must be an affirmative showing in the trial court that a guilty plea was voluntarily and knowingly given before it can be accepted. 395 U.S. at 242. Similarly, our Tennessee Supreme Court in *Mackey* required an affirmative showing of a voluntary and knowing guilty plea, namely, that the defendant has been made aware of the significant consequences of such a plea. *Pettus*, 986 S.W.2d at 542. The standard is the same for a "best interest" or *Alford* plea, that is, "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Alford*, 400 U.S. at 31.

A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is "knowing" by questioning the defendant to make sure he fully understands the plea and its consequences. *Pettus*, 986 S.W.2d at 542; *Blankenship*, 858 S.W.2d at 904.

Petitioner has failed to show that but for trial counsel's alleged deficiencies, he would have refused to plead guilty and insisted on going to trial. Petitioner testified that he felt he had no choice but to take the offer because trial counsel did not "give a damn" about his case. However, the transcript of the guilty plea hearing reflects that the trial court discussed the ramifications of the guilty plea with Petitioner. Petitioner was thoroughly questioned by the trial court to ascertain whether he understood the effects of the plea.

The plea hearing also indicates that Petitioner knew what he was doing, understood the plea, and agreed that it was what he wanted to do to resolve the case. Petitioner has failed to show by clear and convincing evidence that he received ineffective assistance of counsel or that his guilty plea was involuntary. Moreover, Petitioner has failed to prove he did not understand the consequences of his plea. Trial counsel testified that Petitioner was the one who wanted to seek a plea deal and that he reviewed the deal with Petitioner prior to its entry. The post-conviction court accredited the testimony of trial counsel. "[Q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact," and the post-conviction court's credibility determinations are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). We find no evidence to preponderate against the findings of the post-conviction court. Further, Petitioner has failed to show that there is a reasonable probability that the proceedings would have concluded differently had counsel performed as Petitioner now claims he should have. *Vaughn v. State*, 202 S.W.3d 106, 120 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 687). The evidence does not preponderate against the determination of the post-conviction court.

*Norwood v. State*, 2013 WL 1043556, at *4-6.

A claim that ineffective assistance of counsel has deprived a habeas petitioner of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance. The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Harrington v. Richter*, 562 U.S. at 104 (internal quotation marks and citations omitted).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Strickland*, 466 U.S. at 694.[6]  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding.  Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Richter*, 562 U.S. at 104; *see also id.* at 112 ("In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . .  The likelihood of a different result must be substantial, not just conceivable.") (citations omitted); *Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to 'rule out' [a more favorable outcome] to prevail.  Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

The two-part test stated in *Strickland* applies to challenges to guilty pleas based on the ineffective assistance of counsel.  *Hill v. Lockhart*, 474 U.S. 52, 57-58 (1985).  "Where, as here, a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases."  *Id.* at 56 (internal quotation marks omitted).  "[T]o satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  *Id.* at 59; *see also Padilla v. Kentucky*, 559 U.S. 356, 372 (2010) ("[T]o obtain relief on this type of claim, a [prisoner] must convince the court that a decision to

---

[6] "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant."  *Id.* at 697.  If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient.  *Id.*

reject the plea bargain would have been rational under the circumstances.").[7]   A prisoner "cannot make that showing merely by telling [the court] now that [he] would have gone to trial then if [he] had gotten different advice.   The test is objective, not subjective . . . ."   *Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012).   "[I]t is often quite difficult for petitioners who have acknowledged their guilt to satisfy *Strickland*'s prejudice prong."   *Padilla*, 559 U.S. at 371 n.12.

"Surmounting *Strickland*'s high bar is never an easy task."   *Id.* at 371.

An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve.   *Strickland*, 466 U.S., at 689-690, 104 S. Ct. 2052.   Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.   It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence."   *Id.*, at 689, 104 S. Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.   *Strickland*, 466 U.S., at 690, 104 S. Ct. 2052.

---

[7] The Supreme Court emphasized that,

[i]n many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than going to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.

*Hill*, 474 U.S. at 59.

*Richter*, 562 U.S. at 105.

When an ineffective assistance claim is reviewed under § 2254(d), the review is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S. Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles,* 556 U.S., at 123, 129 S. Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105.

Because the § 2254 Petition does not address the standards for evaluating habeas claims on the merits, it is unclear whether Norwood contends that the decision of the TCCA was "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or whether it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

Norwood has not established that the decision of the TCCA was contrary to *Strickland v. Washington* and *Hill v. Lockhart*. This is "a run-of-the-mill state-court decision applying the correct legal rule . . . to the facts of a prisoner's case" and, therefore, it "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams v. Taylor*, 529 U.S. at 406.[8]

---

[8] The Supreme Court has emphasized the narrow scope of the "contrary to" clause, explaining that "a run-of-the-mill state-court decision applying the correct legal rule from our

Norwood also has failed to satisfy his burden of demonstrating that the decision of the TCCA was an unreasonable application of *Strickland* and *Hill* or that it was based on an objectively unreasonable factual determination. The TCCA's conclusion that Norwood understood what he was doing when he pled guilty is supported by the evidence. By his own admission, Norwood had several months in which to decide whether the plea deal was in his best interest. During that time, defense counsel met with Norwood on several occasions to review the facts and discuss the plea offer. Trial counsel explained why he believed that Norwood should accept the offer. Norwood eventually wrote his attorney that he had decided to take the plea.[9] At the guilty plea hearing, the trial judge engaged in a lengthy colloquy to ensure that Norwood understood the nature of first degree murder and second degree murder, the possible penalties for each offense, the factual basis for the charge against him, and the rights he was waiving by pleading guilty. Norwood also testified under oath that he was satisfied with the performance of his counsel and that he was entering his plea freely and voluntarily.

Norwood's belated claim that he pled guilty because of the lengthy delays and because his attorney was not working on the case do not undermine his testimony at the guilty plea hearing. The evidence at the post-conviction hearing established that it was the practice of the trial judge to disallow any plea bargaining once a case was set for trial. Therefore, defense counsel explained that he obtained repeated continuances to give Norwood the time he needed to consider whether to accept the plea offer. Although defense counsel conceded that he did not conduct the type of

cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Id.* at 406; *see also id.* at 407 ("If a federal habeas court can, under the 'contrary to' clause, issue the writ whenever it concludes that the state court's application of clearly established federal law was incorrect, the 'unreasonable application' clause becomes a nullity.").

[9] (*See* Post-Conviction Hr'g, Ex. D, *Norwood v. State*, No. 09-06261 (Shelby Cnty. Crim. Ct.), ECF No. 7-2 at PageID 188.)

investigation that he would have if he were going to try the case and did not attempt to interview Arcaya Love, he obtained discovery and shared it with Norwood. That discovery included Norwood's statement to the police; the statement Love gave the police about her relationship with Norwood, his attempts to get back together with her and his threats against the victim, and his history of domestic violence; and the records of Love's complaints to the police about Norwood. At the post-conviction hearing, Norwood was unable to specify anything further that his attorney should have done to prepare for trial. (Post-Conviction Hr'g Tr. 94-95, 96, *id.*, ECF No. 7-3.)

Finally, the TCCA's conclusion that Norwood failed to show prejudice is fully supported by the evidence. The TCCA accredited the testimony of trial counsel that it was Norwood's decision to seek a plea offer. In light of the facts that Norwood had a motive to injure the victim; that he had threatened the victim shortly before the killing; that he went to Love's apartment armed with a handgun, at a time when he had reason to believe that Love and the children would be absent and the victim present; that he stabbed the victim five times while sustaining no injuries; and that he took the knife (which he claimed to have found in the apartment) with him when he left and disposed of it, the risk of a first-degree murder conviction and life sentence was real. Norwood has not identified any witnesses his attorney should have interviewed or defense he should have prepared that would have had a reasonable likelihood of producing an acquittal or a conviction on a less serious charge. A reasonable defendant in Norwood's position would have done precisely what he did and accepted the plea offer of second degree murder.

Because every claim asserted by Petitioner is without merit, the Court **DENIES** the § 2254 Petition. The § 2254 Petition is **DISMISSED WITH PREJUDICE**. Judgment shall be entered for Respondent.

**V.         APPEAL ISSUES**

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. *Miller-El v. Cockrell*, 537 U.S. at 335; *Bradley v. Birkett*, 156 F. App'x 771, 772 (6th Cir. 2005). The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner.   Rule 11, Rules Governing Section 2254 Cases in the United States District Courts.   A petitioner may not take an appeal unless a circuit or district judge issues a COA.   28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required showing.   28 U.S.C. §§ 2253(c)(2) & (3).   A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."   *Cockrell*, 537 U.S. at 336 (internal quotation marks omitted); *see also Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same).   A COA does not require a showing that the appeal will succeed.   *Cockrell*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814-15 (6th Cir. 2011).   Courts should not issue a COA as a matter of course.   *Bradley*, 156 F. App'x at 773.

In this case, there can be no question that the § 2254 Petition is meritless for the reasons previously stated.   Because any appeal by Petitioner on the issues raised in his § 2254 Petition does not deserve attention, the Court **DENIES** a certificate of appealability.

Rule 24(a)(1) of the Federal Rules of Appellate Procedure provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting

affidavit. However, if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *See* Fed. R. App. P. 24(a) (4)-(5). In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore **CERTIFIED**, pursuant to Federal Rule of Appellate Procedure 24(a), that any appeal in this matter would not be taken in good faith, and leave to appeal *in forma pauperis* is DENIED.[10]

      IT IS SO ORDERED this 1st day of August, 2016.

                **s/ S. Thomas Anderson**
                S. THOMAS ANDERSON
                UNITED STATES DISTRICT JUDGE

---

[10] If Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within 30 days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).